SALLY H. McCUNE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
McCune v. Commissioner
Docket No. 35618-86.
United States Tax Court
T.C. Memo 1988-513; 1988 Tax Ct. Memo LEXIS 539; 56 T.C.M. (CCH) 562; T.C.M. (RIA) 88513; October 31, 1988. Sally H. McCune, pro se. Frank M. Schuler, for the respondent. RUWE
MEMORANDUM FINDINGS OF FACT AND OPINION RUWE, Judge: Respondent determined deficiencies in petitioner's Federal income tax and additions to tax as follows: Additions to Tax
Year
Deficiency
Sec. 6659 [1]
Sec. 6653(a)
Sec. 6653(a)(1)
Sec. 6653(a)(2)
1980
$ 3,795
$ 1,139
$ 190
-- --
1981
732
--
--
37 50 percent of interest due on $ 732.
1982
1,710
440
--
85 50 percent interest due on $ 1,710.
The issues for decision are: (1) Whether *541 petitioner is entitled to her distributive share of partnership loss and investment tax credit relating to a master recording lease venture, (2) whether petitioner is liable for additions to tax under section 6653(a) and section 6659, and (3) whether petitioner is liable for the increased rate of interest provided in section 6621(c). [2]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioner resided in Kansas City, Missouri, when she filed her petition in this case. In early 1982, James Troester (Mr. Troester), a broker who sold insurance and other investments such as annuities, contacted petitioner at the suggestion of petitioner's close friend and neighbor. Petitioner questioned her neighbor about Mr. Troester's background and learned that Mr. Troester lived locally and for over 20 years had dealt in the fields of investments and insurance. Mr. Troester offered petitioner the opportunity to invest in approximately 250 *542 different master recordings of performing artists. Mr. Troester never represented to petitioner that he had a background in the record industry. Petitioner had no background in the music or record business. Petitioner invested in one of the master recordings offered by Mr. Troester. On May 26, 1982, petitioner wrote a check for $ 4,000 to Solid Gold Productions (Solid Gold). Solid Gold acknowledged receipt of this amount "as rental payment for the following Master Recording(s) Willie Nelson." At this time, petitioner had not heard any of the songs on the Willie Nelson recording, nor did petitioner know what songs would be on it. Petitioner had heard of Willie Nelson and knew of his work. Petitioner believed that the songs on the recording would be from a certain era or of a certain type and would be written mostly by Willie Nelson. Petitioner first heard the songs on the Willie Nelson recording sometime in 1983. Petitioner planned to invest in the Willie Nelson recording through a partnership. As of May 26, 1982, when petitioner wrote her check to Solid Gold, the partnership had not been formed and petitioner did not know who the other partners would be. Through her *543 broker, Mr. Troester, petitioner learned that the other partners probably would come from St. Joseph, Missouri, and that a Mr. Krueger had expressed a willingness to be managing partner. On July 28, 1982, Solid Gold entered into an agreement with Master House, Inc. (Master House). The agreement provided that Solid Gold wished to purchase the two track master to master recording described as, Willie Nelson "The Ghost." The parties agreed that Master house would transfer to Solid Gold all "right, Title, and interest" in the master. The transfer included tangible rights as evidence by the physical master and intangible rights, including: The right to manufacture and reproduce records and tapes from the Master; The right to merchandise and exploit for commercial reasons on a worldwide basis; The right to use the Artist Name and likeness, and any other rights necessary to enjoy the use of the Master conveyed herein. Solid Gold Production, Inc. is also specifically granted the rights to assign or otherwise reconvey the Third Parties, consistent with this agreement. The stated consideration for this transfer was $ 500,000. Solid Gold paid $ 7,500 in cash and gave a promissory note *544 of $ 492,500 for the remainder. The note, due July 28, 1994, bore an annual interest rate of 9 percent. No payment was due on this note before its maturation date except that if Solid Gold elected to distribute records, it was required to pay to Master house one-half of the net cash received from distributors after payment of any royalties. In conjunction with this sale, the parties executed a security agreement in which Solid Gold granted to Master House a security interest in the master recording and the proceeds which Solid Gold derived from the sale, use or exploitation of the master recording. The Willie Nelson recording entitled, "The Ghost," was composed of the following selections: Side One
Side Two
The Ghost
Go Away
Let's Pretend
No Tomorrow in Sight
I'm Going to Lose a Lot
A New Way to Cry
of Teardrops
Broken Promises
Waiting Time
Willie Nelson wrote all of the songs on this tape. The sound and style of the recording indicates that it was made in the 1960s. In 1975, with the release of "Blue Eyes Crying in the Rain," Willie Nelson established himself as a major recording artist. In August 4, 1982, Solid Gold, as lessor, entered *545 into a nonexclusive lease agreement [3] with a partnership called Northwest Missouri Record Company (Northwest), as lessee, to lease "the described master recording in the following configuration: Willie Nelson." This nonexclusive lease agreement pertained to the master recording called "The Ghost" by Willie Nelson. Under the lease, Solid Gold granted to Northwest the right to sublease and engage in distributionor other revenue producing activities with respect to the master recording. The lease provided that the manufacturer or distributor, rather than Solid Gold, was responsible for paying all artists, writer and publishing royalties. The lease was for a term of seven years and one month and provided for rental payments of $ 20,000 during the first year and $ 12,000 prorated over the following six years. Northwest did not follow these payment terms but instead paid the entire $ 32,000 in 1982. The lease also contained the following provisions: *546 PURCHASE OPTION: The lessee shall not have the option to purchase the master recording. * * * INVESTMENT TAX CREDIT: It is agreed by signature hereon that the lessor agrees to pass the investment tax credit to the lessee. To effect this lease provision regarding investment tax credit, Solid Gold and Northwest entered into an agreement to transfer the investment tax credit, with respect to the Willie Nelson master, from Solid Gold to Northwest. The agreement provided that the cost basis of the master recording was $ 500,000 and that its estimated useful life was 12 years. Solid Gold provided prospective investors with a copy of a brochure captioned, "THE 1982 MASTER RECORDING LEASE PROGRAM, An Investment Opportunity with Substantial Tax Benefits," to explain its program to them. Petitioner received a copy of this brochure. This brochure provided, in part: In the first twelve months of the lease, the Lessee receives approximately $ 1.87 of tax savings (not tax write-off) for every $ 1.00 invested, has no potential recapture or preference income problem, and has an investment that should provide an economic return that generates dollars in an amount greater than taxable *547 income. A financial summary in the brochure projected that to break even on a $ 16,000 lease, the lessee must sell 80,000 records. This projection assumed that the lessee would receive net cash of 20 cents per record. The brochure contained the following questions and answer summary: (Q) WHY AN ARMS-LENGTH TRANSACTION WITH "HARD DEBT" RECOURSE NOTES FROM A NON-AFFILIATED CORPORATION? (A) To make certain that the lease program complies with all application sections of the IRS code and thus protect the tax benefits of the Lessee (see tax opinion). (Q) WHY AN 85-MONTH LEASE? (A) To provide for a reasonable leasing period and revenue therefrom and to ensure the full 10 per cent investment tax credit. (Q) WHY A 12-YEAR PROGRAM? (A) Music that is selected and other recordings are expected to have a 12-year distribution life. Solid Gold plans to engage in distribution for for [sic] 12 years on this product. (Q) WHY NO PURCHASE OPTION? (A) So as to preclude the IRS from considering this a purchase agreement and losing the right to pass the investment tax credit to the Lessee. (Q) WHY A NON-EXCLUSIVE LEASE? (A) So as to preclude the IRS from considering this *548 a purchase agreement and losing the right to pass the investment tax credit to the Lessee. (Q) WHY UNITED STATES RIGHT ONLY? (A) So as to prevent the IRS from disallowing the investment tax credit because of foreign distribution activity by the Lessee. * * * (Q) IS THERE RECAPTURE IN LATER YEARS? (A) A common problem with most tax sheltered investments is recapture. This program has no such problems because the tax benefits in this program are not the result of write-offs which are subject to recapture. Recapture of the investment tax credit is avoided by keeping the equipment in service for the prescribed seven years, or in this case, meeting the lease requirements of paying the Sixteen Thousand Dollars ($ 16,000) due to the Lessor. (NOTE: BECAUSE THERE ARE NO "PAPER LOSSES" OR "PAPER INCOME", EVERY DOLLAR OF TAXABLE INCOME IS EVIDENCED BY CASH.) The brochure cautioned that: Due to the competitive nature of the record industry and the subject nature of the public's acceptance of records, the profit potential of any record is extremely speculative and an investment in the lease of a Recording is subject to a high degree of risk. The profitability of any recording *549 is, of course, a result of its ultimate audience appeal which can rarely be ascertained in advanced with any degree of certainty and over which the Lessee has no control. On August 25, 1982, petitioner signed an Adoption Agreement to participate in Northwest as a general partner. Her prior payment of $ 4,000 to Solid Gold was her entire contribution to Northwest. Petitioner's $ 4,000 contribution represented 12.5 percent of the total initial capital contributed to Northwest and gave her a 12.5 percent interest in the profits and losses of the partnership. Seven other partners contributed to Northwest to give the partnership a capitalization of $ 32,000. Dale Krueger (Mr. Krueger) was the managing partner of Northwest. Mr. Krueger holds a bachelor's and master's degree in economics and a Ph.D in business administration. He was employed with Alco, Gravure in a customer service or sales position until he began to teach at Missouri Western State College. At Missouri Western State College, he taught course in marketing, advertising, and sales management. Mr. Krueger left the decisions regarding a marketing plan up to the partners as a group. In 1982, pursuant to a marketing plan *550 set up by the broker, Mr. Troester, Northwest entered into agreements with Sterling Management Co. (Sterling) and B & L Distributing Co. (B & L). [4] The owner of Sterling was the brother of the president of Solid Gold. The agreement between Northwest and Sterling was entitled, Non-exclusive Leasing Agency Agreement. This agreement appointed Sterling to be Northwest's agent to negotiate leases, distribution agreements and any other agreement for the production of income with respect to the Willie Nelson recording which Northwest leased from Solid Gold. Sterling agreed to release the master recording through appropriate *551 outlets but retained sole discretion regarding the manner of distribution. Under the agreement, Sterling was to pay Northwest 20 cents per unit or 25 percent of the cash received annually. In conjunction with the management agreement with Sterling, Northwest also entered into an agreement with B & L to lease one rack for a term of 7 years. A "rack" is a cardboard box used to display cassette recordings in a store. Northwest leased only one rack because the partners were unsure whether Sterling and B & L would stay in business and because the IRS had begun to challenge record promotion agreements similar to the one Northwest had entered into with Solid Gold. The rack which Northwest leased was placed in a store in California because the president of Sterling was in California. Northwest paid Sterling and B & L a total of $ 650 in 1982 in management and promotion fees. In 1983, Northwest paid Sterling $ 200 in management fees. Petitioner paid her share of these fees by issuing a check for $ 56.25 to B & L in 1982 and issuing a $ 25 check to Sterling in each of the years 1982 and 1983. During the time the Willie Nelson cassettes were displayed in the rack in California, approximately *552 15 tapes were sold at a price of about $ 4 and $ 5 per cassette. On its U.S. Partnership Return of Income, Northwest reported no gross receipts for the taxable year 1982 and $ 26 in gross receipts for the taxable year 1983. Sterling ceased doing business in late 1984 and Northwest entered into a Non-exclusive Agency Agreement with Sajack on April 23, 1985. Sajack, a subchapter S corporation, was owned by individuals from the Kansas City area who had purchased master recordings from Solid Gold or other promoters. Petitioner purchased 300 shares of the capital stock of Sajack for $ 300 on February 11, 1985. Sajack ran 12 commercials for the Willie Nelson recording on Kansas City television over a two-week period. The advertized price was $ 8.95 per record or tape. From these commercials, Sajack sold approximately 8 records and 8 cassettes. Northwest received no income from these record and cassette sales because the cost of producing the commercials exceeded the amount earned from the sales. After the IRS began to investigate Northwest's investment in the Willie Nelson recording, Northwest discontinued its marketing efforts. Northwest filed a Form 1065, U.S. Partnership *553 Return, for the period beginning August 4, 1982, and ending December 31, 1982, showing a loss of $ 8,983.36. Petitioner's claimed share of the partnership loss was approximately $ 1,123.00. Petitioner reported this loss on her 1982 Federal income tax return. Petitioner's also claimed an investment tax credit of $ 6,251.10 on her 1982 return from her investment in Northwest. This claimed credit was based on a 12.5-percent interest in new property having an alleged fair market value of $ 500,000.00. On November 21, 1983, petitioner filed a Form 1045, Application for Tentative Refund, to carry back her investment tax credit of $ 6,251.10 to 1979, 1980, and 1981. Petitioner claimed a decreased in tax of $ 3,795.00 for 1980 and $ 732.10 for 1981 as a result of this carryback for which she received a refund. In the notice of deficiency, respondent disallowed petitioner's claimed loss of $ 1,123 from Northwest. Respondent also disallowed the investment tax credit claimed for 1980, 1981, and 1982. OPINION The first issue is whether respondent properly disallowed petitioner's deduction for her share of partnership losses and investment tax credit with respect to the least of the *554 Willie Nelson master recording. Petitioner bears the burden of establishing that she is entitled to the claimed deduction and credit. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). A threshold for the claimed tax benefits is that the taxpayer be engaged in an activity for profit. Secs. 183 and 48(a); Soriano v. Commissioner,90 T.C. 44 (1988). Whether and activity is engaged in for profit depends on whether the activity was undertaken with the objective of making a profit. Jasionowski v. Commissioner,66 T.C. 312, 319 (1976). Although petitioner need not have a reasonable expectation of profit, she must have entered into the activity, or continued it, with an actual and honest objective of profit. Dreicer v. Commissioner,78 T.C. 642, 644-645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). The issue of profit objective must be resolved at the partnership level. Brannen v. Commissioner,722 F.2d 695, 703-704 (11th Cir. 1984), affg. 78 T.C. 471 (1982). *555 Tax benefits will also be lost and the transaction ignored for Federal tax purposes if "the taxpayer was motivated by no business purpose other than obtaining tax benefits in entering the transaction, and * * * the transaction has no economic substance because no reasonable possibility of a profit exists." Rice's Toyota World, Inc. v. Commissioner,752 F.2d 89, 91 (4th Cir. 1985), affg. on this issue and on another issue 81 T.C. 184 (1983). The economic substance test is an objective test, not determined by subjective intent. Rose v. Commissioner,88 T.C. 386 (1987), on appeal (6th Cir., Dec. 14, 1987). We have also applied an objective test, under which transactions involving "generic tax shelters" will be disregarded for Federal income tax purposes if we find they are devoid of economic substance. Rose v. Commissioner, supra.The purpose of the test formulated in Rose is to unify the objective test applied in determining economic substance with the subjective test of section 183 by emphasizing the objective factors *556 which are relevant to both tests. By adopting this test, we avoid the need to weigh objective facts against a taxpayer's statement of intent and also achieve consistent results in cases of similarly situated taxpayers. Rose v. Commissioner, supra at 414. Under the Rose test, a "generic tax shelter" possesses some or all of the following characteristics: (1) The materials promoting the program focus on the tax benefits; (2) the investors accepted the agreement without negotiation of price or terms; (3) the assets in question consist of packages of purported rights, difficult to value in the abstract and substantially overvalued in relation to tangible property included as part of the package; (4) the tangible assets were acquired or created at a relatively small cost shortly before the transaction in question; and (5) the bulk of the consideration was deferred by promissory notes, nonrecourse in form or in substance. Rose v. Commissioner, supra at 412. We find that Northwest's lease of the Willie Nelson master recording possesses the characteristics of a generic tax shelter. The promotional materials which Solid Gold provided to the partners *557 of Northwest focused on the tax benefits of the lease. The partners of Northwest accepted the terms and payments provided in the lease without negotiation. The right to commercially exploit the Willie Nelson recording is difficult to value in the abstract and was substantially overvalued in relation to the tangible property, i.e., the master recording. Although Northwest did not use notes to finance the lease with Solid Gold, Solid Gold deferred the bulk of the consideration which it agreed to pay Master House for the Willie Nelson recording by valueless promissory notes. We have determined that Northwest's activity with respect to the Willie Nelson recording falls within the definition of generic tax shelter. Accordingly, we must decided under the objective test in Rose, whether the transaction is devoid of economic substance. Rose and its progency have considered several factors to determine whether an activity is devoid of economic substances. These factors are: (1) The investment activities of petitioner, (2) the relationship between price and fair market value, (3) the structure *558 of the financing, and (4) perceived Congressional intent. 1. Petitioner's Investment Activities
Our review of the record convinces us that petitioner did not approach her investment in the Willie Nelson master recording in a business-like manner with the intent of making a profit. Neither petitioner, nor Mr. Troester, the broker, had any background in the music business. Petitioner, nevertheless, invested in the Willie Nelson recording without knowing what songs would be on the tape, without listening to the recording, and without any independent research as to the potential profitability of the recording. Further, at the time of her investment, petitioner did not know the identity of the managing partner or any of the other partners in this investment; yet, petitioner intended to rely on the judgment of the managing partner in marketing the Willie Nelson recording. The evidence also indicates that none of the other partners in Northwest made any serious effort to assess the profitability of the Willie Nelson recording. Mr. Krueger, the managing partner, had no background in the music industry and, although he testified about his background in marketing, he left the *559 decisions regarding a marketing plant up to the other partners. No evidence was presented to show that any of these partners had any expertise in marketing. The partners of Northwest failed to follow distribution practices which were likely to lead to the success of the venture. The partners retained Sterling and B & L pursuant to a plant set up by the broker, Mr. Troester. The record does not indicate that the partners of Northwest considered other distributors even though they had doubts about whether Sterling would remain in business. Respondent's expert witness, John F. Wiedemann, reviewed the agreements Northwest entered into with Sterling and B & L. He considered the terms and conditions of the Non-exclusive Leasing Agency Agreement between Northwest and Sterling to be confusing and noted that this type of agreement was not used commonly within the music industry. He found that this agreement was missing important terms regarding the prices for the products to be sold and Sterling's costs. With regard to Northwest's agreement to lease a cardboard "rack" from B & L, Mr. Wiedenmann concluded that it is unheard of within the music industry to lease what it essentially a *560 cardboard box for 7 years and that this agreement would not improve the market potential for the recording. Mr. Wiedemann has had many years of experience in the music industry, and we accept his testimony regarding these agreements and Northwest's marketing strategy. The Non-exclusive Lease Agreement which Northwest entered into with Solid Gold also indicates that the partners of Northwest were not concerned with the success of the venture. This lease agreement does not describe the master recording in sufficient detail for the partnership to identify the asset it leased. It lists only the name of the artist but does not include even the title of the recording. Also, because the lease agreement with Solid Gold conveyed only non-exclusive rights to exploit the master recording, Solid Gold could lease the same Willie Nelson recording to others who would compete with Northwest if the recording ever became popular. Neither petitioner's testimony, nor that of the managing partner, Mr. Krueger, convince us that they believe the venture would succeed economically. Mr. Krueger stated equivocally that: "We, sort of as a group, maybe felt that there was a possibility that profits could *561 entail". 2. Relationship between Fair Market Value and Price
Transfer of ownership of an asset at a grossly inflated sales price in one of the distinguishing features of an economically distored tax shelter. Soriano v. Commissioner, supra at 54. Petitioner claimed an investment tax credit from her investment in the Willie Nelson recording which was determined by valuing the master recording at $ 500,000. Mr. Krueger, the managing partner, testified that the $ 500,000 valuation was based on the $ 7,500 cash payment and promissory note for $ 492,500 which Solid Gold gave to Master House as consideration for the Willie Nelson recording. No evidence was introduced regarding how Master House and Solid Gold arrived at the $ 500,000 figure. We find no basis for this $ 500,000 valuation and consider the stated consideration between Solid Gold and Master House to be part of a scheme to inflate the value of the recording and the corresponding investment tax credit. Respondent's expert witness, Mr. Wiedenmann, concluded that the fair market value of the master *562 recording rights received by Northwest would not exceed $ 7,500. We agree with Mr. Wiedenmann's valuation. Mr. Wiedenmann was experienced in appraising master recordings and performed a thorough analysis of the Willie Nelson recording and its background. Mr. Wiedenmann testified that, although the quality of the recording was acceptable, the sound and the style were "dated" and that such recordings have not achieved success in the popular market. Mr. Wiedenmann also testified that no chain of title information is available for this Willie Nelson master recording and without proper title the lease rights could be worthless. The value of this Willie Nelson recording was in the tax savings it would produce, rather than its profit potential. 3. Structure of the Financing
A sale financed by deferred debt which is substance or in fact is not likely to be paid is an indicia of lack or exaggeration of economic substance. Rose v. Commissioner, supra at 419. Our analysis must focus on the substance rather than the form of the debt. Waddel v. Commissioner,86 T.C. 848, 902 (1986), *563 affd. 841 F.2d 264 (9th Cir. 1988). In this case, Solid Gold executed a note for $ 492,500 to finance the purchase of the Willie Nelson master recording from Master House. Although this was stated to be a recourse note, no payment of principal or interest was due for 12 years, except from the net proceeds of any record sales. The amount of the promissory note was highly inflated in relation to the value of the recording. This note was so commercially unreasonable that we do not believe it was ever intended to be repaid. Rather, the note was used to inflate the value of the master recording to increase the amount of the investment tax credit. Although Northwest did not incur any indebtedness in this case, it benefitted from the inflated valuation when Solid Gold elected to pass through the investment tax credit to Northwest. The promissory note was therefore an integral part of the arrangement between Solid Gold and Northwest and indicates lack of economic substance in this case. [5]
4. *564 Perceived Congressional Intent
We do not believe that Congress intended to encourage investment in master recording ventures like the one at issue. See Rose v. Commissioner, supra at 421-422. From our analysis of the investment activities of the partnership, the disparity between the claimed value of the recording and its actual fair market value, and the underlying financial structure, we find that Northwest's leasing activity was devoid of economic substance and should be disregarded for tax purposes. Therefore, we must disallow petitioner's claim to her allocable share of partnership losses and investment tax credit for the year of her investment, 1982, and for the years of the related carryback of investment tax credit, 1980 and 1981. Additions to Tax
Section 6653(a) imposes an addition to tax if any part of the underpayment is due to negligence or intentional disregard of rules or regulations. For taxes paid after December 31, 1981, section 6653(a)(1) imposes a similar addition to tax. Section 6653(a)(2) imposes an addition only with respect to that *565 portion of the underpayment attributable to negligence or intentional disregard of rules or regulations. Petitioner bears the burden of proof on this issue. Bixby v. Commissioner,58 T.C. 757, 791-792 (1972). Petitioner entered into this leasing transaction without any experience in the music industry and without seeking the advice of anyone who had experience in the music industry. When she entered into this investment, petitioner did not know precisely what she was leasing or who would be making the business decisions for the partnership. The brochure explaining the investment promised $ 1.87 in tax savings for each $ 1.00 invested regardless of income from marketing the recording. One in petitioner's shoes should have been alerted that something was probably wrong. Petitioner has not shown that she exercised the care of a reasonable and prudent person in claiming the deductions and credit in issue. See Neely v. Commissioner,85 T.C. 934, 947 (1985). According, the imposition of additions to tax under section 6653(a) is appropriate in this case. Additions to Tax under Section 6659
Respondent determined additions to tax under section *566 6659 for the taxable years 1980 and 1982. Section 6659 imposes a graduate addition to tax on individuals whose underpayment of tax equals or exceeds $ 1,000 and is attributable to a valuation overstatement. A valuation overstatement exists if "the value of any property, or the adjusted basis of any property, claimed on any return is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be.) Sec. 6659(c)(1). If the valuation claimed exceeds 250 percent of the correct valuation, the addition is equal to 30 percent of the underpayment, but only to the extent attributable to the valuation overstatement. Petitioner determined an investment tax credit with reference to a claimed adjusted basis in the master recording. We have found that the leasing transaction is devoid of economic substance and is to be disregarded for tax purposes. Accordingly, petitioner has no adjusted basis in the master recording for purposes of the investment tax credit. See Zirker v. Commissioner,87 T.C. 970, 978-979 (1986). Since *567 the adjusted basis claimed on the return exceeds the correct adjusted basis by 250 percent, there is a valuation overstatement and the applicable percentage is 30 percent. Sec. 6659(b) and (c). [6]
Additional Interest under Section 6621(c)
Respondent determined that petitioner was liable for additional interest under section 6621(c) for the taxable years 1980 and 1982. Section 6621(c) provides that with respect to interest payable under section 6601, an increased rate of interest is imposed when there is a "substantial underpayment" (at least $ 1,000) "attributable to one or more tax motivated transactions." The additional interest accrues after December 31, 1984, even *568 though the transaction was entered into prior to the enactment of section 6621(c). Solowiejczyk v. Commissioner,85 T.C. 552 (1985), affd. per curiam without published opinion 795 F.2d 1005 (2d Cir. 1986). Section 6621(c)(3) includes within the definition of tax motivated transaction any valuation overstatement within the meaning of section 6659(c). Congress specifically amended section 6621(c)(3)(A) to add to the list of tax-motivated transactions, "(v) any sham or fraudulent transaction." [7] This Court has recently interpreted section 6621(c)(3)(A)(v) to include transactions which were without economic substance. Patin v. Commissioner,88 T.C. 1086, 1128-1129 (1987), affd. without published opinion sub nom. Hatheway v. Commissioner,856 F.2d 186 (4th Cir. 1988). We have determined a valuation overstatement with respect to that portion of the underpayment attributable to the disallowance of investment tax credit. We have also determined that the transaction at issue *569 was without economic substance and was therefore a sham. Accordingly, in this case interest will be imposed under section 6621(c) on the entire underpayment for the taxable years 1980 and 1982. Decision will be entered for the respondent.
Footnotes
1. Unless otherwide indicated, all section references are to the Internal Revenue Code, as amended and as in effect during the years in issue and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Former section 6621(d) was redesignated as section 6621(c)↩ pursuant to section 1511(c), Tax Reform Act of 1986, 100 Stat. 2744.
3. The use of such terms as "lease," "agreement," "purchase," and "paid" to described the transactions involved in this case should not be construed as carrying any conclusions as to the legal effect of the documents and transactions.↩
4. Petitioner did not introduce into evidence the actual agreements Northwest entered into with Sterling and B & L. The parties have introduced into evidence samples of Sterling's and B & L's preprinted contracts but have not stipulated that these are identical to the agreements Northwest signed. Petitioner has not claimed that these preprinted contracts differ from the agreements Northwest signed. In view of petitioner's failure to introduce into evidence the actual signed agreements, we will treat these preprinted contracts as evidence of the actual agreements.↩
5. See Avers v. Commissioner,T.C. Memo. 1988-176; Apperson v. Commissioner,T.C. Memo. 1987-571↩, on appeal (7th Cir. Mar. 9, (1988).
6. Section 6659 applies for returns filed after Dec. 31, 1981. Although petitioner filed her 1980 return prior to that date, section 6659 is nevertheless applicable because the underpayment of tax for that year is attributable to the carryback of unused investment tax credit claimed on her 1982 return. Nielsen v. Commissioner,87 T.C. 779 (1986); Avers v. Commissioner,T.C. Memo. 1988-176↩.
7. Pub. L. 99-514, sec. 1535(a), 100 Stat. 2085, 2750. This amendment is effective with respect to interest accruing after Dec. 31, 1984.↩